IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 19-635 |
| | : | |
| JAMAR HUNTER | : | |

**MEMORANDUM**

**Chief Judge Juan R. Sánchez**                                                                                **August 12, 2021**

      Defendant Jamar Hunter is indicted with one count of being a felon in possession of a firearm. Hunter moves to suppress evidence of a firearm found tucked in his waistband during a patdown search as part of a traffic stop by Pennsylvania State Police Trooper. Hunter argues the patdown violated his Fourth Amendment rights. After completing the tasks necessary to investigate and resolve the traffic infraction and before the patdown, the Trooper conducted an additional criminal background check unrelated to the traffic violation. Because the additional criminal background check was unrelated to the traffic violation, the Trooper was required to have reasonable suspicion in order to prolong the stop and inquire into Hunter's criminal history. The Court, however, concludes the Trooper did not have reasonable suspicion to conduct the criminal background check and the authority for the traffic stop had therefore ended. The prolonged seizure, including the patdown, was thus unconstitutional. The Court will therefore grant Hunter's motion to suppress evidence of the firearm.

**FINDINGS OF FACT**[1]

On December 12, 2018, Pennsylvania State Trooper Galen Clemons was on patrol in the area surrounding Route 291 and Stewart Avenue in Ridley Township, Pennsylvania. Around 11:21 a.m., while driving northbound on Industrial Highway, Trooper Clemons observed a silver Chrysler 300 exceeding the speed limit. Trooper Clemons then positioned his marked police cruiser behind the Chrysler 300 and "clocked" it at a speed of 58 miles per hour. *See* Tr. 18:23–19:11. The posted speed limit on this highway was 35 miles per hour. *See id.*

Trooper Clemons followed the Chrysler 300 and saw it change lanes without using a turn signal. Then, using a turn signal, the driver made another lane change and crossed over a solid white line to make a left turn. The vehicle immediately turned onto Stewart Avenue. The driver of the vehicle committed three Pennsylvania Vehicle Code violations by speeding, changing lanes without a signal, and changing lanes over a solid white line.

After turning onto Stewart Avenue, Trooper Clemons activated his emergency lights and sirens to pull over the Chrysler 300 and initiate a traffic stop. The driver of the Chrysler 300 immediately pulled over. Before approaching the car, Trooper Clemons searched for the registration of the license plate. Trooper Clemons discovered the car was registered to a private rental car company and had New York tags.

Hunter was driving on Route 291 towards nearby Interstate-95. Hunter was not, however, driving *on* I-95.[2]

---

[1] The following factual findings are based on the evidence presented at the suppression hearing, including, most prominently, the testimony of the Pennsylvania State Trooper Galen Clemons and a dashcam video (DCV) footage of the traffic stop. The Court credits much of Trooper Clemons's testimony, except as noted below.

[2] According to Trooper Clemons, the area in which the traffic stop occurred is a high intensity drug trafficking area, *see* Tr. 33:19–25, and I-95 is a "drug trafficking corridor." *Id*. Because Trooper

After the vehicle pulled over, Trooper Clemons exited his cruiser and approached the driver. Trooper Clemons identified the driver of the vehicle as Defendant Jamar Hunter. Once Trooper Clemons approached the car, Hunter answered all questions and was compliant with Trooper Clemons's instructions.[3] While speaking with Hunter, Trooper Clemons saw a passenger sitting in the front passenger seat. The passenger was later identified as Deshaun Davis. The passenger was holding a phone up to his left ear and facing forward. The passenger was also compliant with Trooper Clemons's questions and requests, including providing identification.[4]

Trooper Clemons talked briefly with Hunter. Trooper Clemons asked if Hunter was from the area. Hunter responded that he was from the area and stated he was going to the gas station and then to Philadelphia to see his grandmother. Trooper Clemons asked Hunter where his own car was and how long he had the rental. Hunter stated his truck was in the shop and that he had the rental car for three weeks.

---

Clemons's testimony on this fact is generalized and fails to provide specific facts regarding the location of where Hunter was stopped, the Court affords this testimony little credible weight.

[3] Trooper Clemons testified that upon approaching the car, Hunter was visibly nervous. Trooper Clemons stated he observed Hunter's legs and arms shaking and described Hunter as trembling, breathing heavily, and "wet" from perspiration. *See* Tr. 31:1–5. After reviewing the dashcam video, the Court does not credit Trooper Clemons's testimony on this issue. In the video, Hunter is completely compliant and is sitting still throughout the encounter. Even though the video has an obstructed view of Hunter, Trooper Clemons's testimony regarding Hunter's "extreme nervousness" is exaggerated. For instance, if Hunter was shaking and trembling in the extreme manner Trooper Clemons describes, it is inconsistent with Hunter's speaking voice, which was calm. There was nothing unusual about Hunter's responses nor does the video show Hunter's alleged nervousness beyond the norm or to the extent Trooper Clemons contends. The Court thus discredits Trooper Clemons's testimony on Hunter's nervousness because the dashcam video fails to support his description.

[4] Trooper Clemons testified the passenger was slumped down in his seat and was trying to shield himself. Trooper Clemons identified this behavior as a sign of nervousness. Even assuming this is true, the video shows the passenger did turn to Trooper Clemons and responded to his questions and request for identification. The Court rejects Trooper Clemons's characterization of the passenger as "shielding" himself because the video does not show that the passenger refused to look at the Trooper or turn his body towards the Trooper.

Hunter and the passenger provided their driver's licenses, and at that time, Trooper Clemons saw three open cell phones in the center console area in addition to the phone the passenger held. Trooper Clemons then took the driver's licenses and returned to his cruiser. After Trooper Clemons walked away and sat inside his cruiser, Hunter and the passenger did not do anything suspicious.[5]

Trooper Clemons then checked into Hunter and the passenger's driver's licenses through a program called "Clean N.C.I.C." Tr. 36:14–17. This traffic check is a normal and routine part of any traffic stop. It determines whether Hunter and the passenger had valid driver's licenses and whether there were any outstanding warrants for either of them. The results of this check revealed that both Hunter and the passenger had a valid driver's license and neither had any outstanding warrants.

After running the initial traffic check, and while still inside his cruiser, Trooper Clemons decided to run an additional criminal background check of both Hunter and the passenger through a different program called "Triple I." Tr. 58:11–16. A criminal background check is not a normal or routine part of a traffic stop. *See* Tr. 58:20–23. Trooper Clemons testified, however, he felt "something was going on," Tr. 59:24–25, and so he decided a background check was warranted. By running the criminal background check of Hunter and the passenger, Trooper Clemons discovered Hunter had a criminal history and was a felon. Hunter's criminal history included convictions for drug trafficking, assault, resisting arrest, evading police officers, and a recent arrest

---

[5] The dashcam video shows Hunter holding a piece of paper outside of the car window. *See* DCV 0:02:37–07:34. When questioned about this, Trooper Clemons indicated this was not an unusual occurrence but could be indicative of nervousness. The Court finds this fact irrelevant and suggests only that Hunter may have tried to get Trooper Clemons's attention.

for gun charges. Trooper Clemons also discovered the passenger's criminal history which included drug trafficking and assault convictions.

After discovering Hunter and the passenger's criminal histories, Trooper Clemons testified he had suspicion that there was criminal activity afoot. *See* Tr. 38:1–9. Trooper Clemons believed Hunter was engaged in drug trafficking and may have been armed. *See id.* Trooper Clemons testified he believed this because (1) Hunter was extremely nervous, (2) the location of the stop and the direction in which Hunter was traveling were suspicious, (3) Hunter drove a rental car, (4) there were four cell phones amongst two people in the car, and (5) Hunter and his passenger had criminal histories including drug and gun charges or convictions.

At this time, Trooper Clemons returned to Hunter's car and asked to speak to him outside of the car. Hunter asked, "why? what happened?" DCV 0:07:39–40. Trooper Clemons assured Hunter he was not in any trouble and just wanted to talk to him about the traffic stop. Hunter stepped out of the car. Trooper Clemons asked Hunter if he had any weapons on him, and Hunter replied "no." Hunter then asked, "why do you want to search me?" DCV 0:07:56–57. Trooper Clemons stated he intended to conduct a patdown for safety. He also stated he "does this to everyone," and it had nothing to do with Hunter in particular. DCV 0:08:00–01. Hunter lifted his hands facing outward and allowed Trooper Clemons to conduct the patdown.

While conducting the patdown, Trooper Clemons immediately felt a hard metal object in Hunter's waist band. Trooper Clemons recognized this object to be a handgun. Trooper Clemons immediately grabbed his own firearm and handcuffed Hunter. Although Hunter repeatedly asked why Trooper Clemons asked him to exit his car and why Trooper Clemons was patting him down, Hunter was fully compliant and did not physically resist Trooper Clemons before or after the firearm was found. Trooper Clemons then walked a handcuffed Hunter back to the police cruiser.

On October 23, 2019, a grand jury returned the one-count Indictment charging Hunter with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Hunter then filed the instant motion to suppress evidence of the firearm arguing the prolonged traffic stop and patdown were unconstitutional. Trooper Clemons testified at the suppression hearing held on June 2, 2021. The parties also provided the Court with the dashcam video of the traffic stop.

**DISCUSSION**

There is no dispute the traffic stop in this case was lawful at its inception. Regardless, a traffic stop can become unlawful at a later time. And that is what happened here. The traffic stop became unlawful after Trooper Clemons completed the routine traffic check and immediately before he conducted the additional criminal background check. Because the additional criminal background check was not related to the mission of the traffic stop, the stop had exceeded its allowable scope under the Fourth Amendment. To lawfully extend the stop beyond the tasks tied to the traffic violations, Trooper Clemons was required to have independent reasonable suspicion illegal activity was occurring before he initiated the additional criminal background check. Because Trooper Clemons did not have independent reasonable suspicion before he conducted the additional criminal background check, the seizure became unlawful from that point forward. The Court will therefore grant Hunter's motion to suppress the handgun seized after the traffic stop's mission concluded.

The Fourth Amendment prohibits unreasonable seizures, but the police may seize or search a suspect if they do so reasonably. *See* U.S. Const. amend IV. "A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). The reasonableness of the duration of a traffic stop "is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, . . . and attend to related safety

6

concerns." *Id.* (citations omitted). The authority for the traffic stop ends when the tasks tied to the traffic infraction are completed. *See id.* A traffic stop can become unlawful if it is prolonged beyond the time necessary to issue a ticket or warning. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Certainly, an officer may conduct unrelated checks and inquiries during a lawful traffic stop. *See Rodriguez*, 575 U.S. at 355. The officer may not, however, prolong the stop absent reasonable suspicion that is ordinarily demanded to justify detaining an individual. *See id.* While it may only take a few moments to perform a criminal background check, there is no de minimus exception to the unlawful extension of a traffic stop. *See id.* at 356–57; *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (discussing whether there is a de minimis exception and stating *Rodriguez* "answered this question with a clear 'no'").

The Third Circuit has discussed the difficulty in pinpointing the exact moment when tasks tied to a traffic stop are completed or reasonably should have been completed (often referred to as the "*Rodriguez* moment"). *See United States v. Garner*, 961 F.3d 264, 270 (3d Cir. 2020). In *United States v. Clark*, the Third Circuit held that from the moment an officer confirmed that a suspect was authorized to drive the vehicle (and there was no question about it), the officer's subsequent criminal history questioning was not tied to the traffic stop's mission. *See* 902 F.3d 404, 411 (3d Cir. 2018). Even though the subsequent questioning lasted only 20 seconds, the brevity of the questioning did not bear on whether it was on- or off-mission. *See id.* at 410 n.4. By confirming the suspect's "authority to drive the vehicle and without any other indicia he lacked that authority, the traffic stop was effectively completed." *Id.*

In *United States v. Green*, the Third Circuit discussed how pinpointing the *Rodriguez* moment "is far easier to articulate than to apply." 897 F.3d at 179. In that case, a suspect was stopped for traffic violations two days in a row, and on the second stop, the officer extended the

7

stop to conduct a dog sniff. *See id.* at 176–77. After an initial conversation with the suspect, the officer returned to his vehicle and made an unrelated call to another officer. After issuing a citation, the officer directed the suspect to remain in his car indefinitely, at which time the officer called for backup. Although the Third Circuit discussed the ambiguities, uncertainty, and division in assessing the *Rodriguez* moment, it ultimately assumed the earlier *Rodriguez* moment (after the initial conversation with the suspect) to be operative. This was because it found reasonable suspicion to support the earlier *Rodriguez* moment which obviated any need to assess any later *Rodriguez* moment. Regardless, in *Green*, it was clear that the most restrictive reading of *Rodriguez* called for finding the *Rodriguez* moment at the earlier point in time when the officer made an unrelated call. *See Green*, 897 F.3d at 182 (noting the phone call was focused on drug trafficking, not speeding).

Finally, in *United States v. Garner*, the Third Circuit again discussed the elusive *Rodriguez* moment and found the relevant moment triggered when an officer began merely questioning the suspect about his criminal history. *See* 961 F.3d at 271. After stopping the suspect for speeding and obtaining the suspect's driver's license and registration, the officer inquired about the suspect's employment, family, and criminal history—none of which was tied to the traffic stop's mission—a speeding violation. *See id.* The Third Circuit noted the questioning was unrelated to the traffic stop because it was "aimed at detecting criminal activity more generally." *Id.* (internal quotation marks omitted).

Considering this background, the Court concludes the *Rodriguez* moment in this traffic stop occurred when Trooper Clemons completed the routine inquiry into Hunter's driver's license (which returned a valid license and no warrants) and before he completed the additional criminal background check. At that moment, Trooper Clemons had all the relevant information he needed

8

to investigate the traffic violation. By confirming Hunter had a valid driver's license and no warrants for his arrest, Trooper Clemons had determined Hunter was authorized to drive the vehicle. Nothing more was necessary for Trooper Clemons to meet the objective of the stop—to ensure roadway safety. *See Clark*, 902 F.3d at 410. The record shows Hunter had the authority to drive the vehicle. And Trooper Clemons did not express any concerns regarding that authority.[6]

A criminal background check, on the other hand, is aimed at "detecting criminal activity more generally," not the mission of the traffic stop. *Garner*, 961 F.3d at 271 (quoting *Green*, 897 F.3d at 179). Trooper Clemons made no claim that the criminal background check assisted him in addressing the traffic violation. In fact, Trooper Clemons testified that a criminal background search was not a normal or routine part of a traffic stop. The criminal background check was thus not tied to the traffic stop's mission and at that moment in time, tasks tied to the traffic violation reasonably should have been completed. *See Rodriguez*, 575 U.S. at 354 ("Authority for the seizure . . . ends when the tasks tied to the traffic infraction are—or reasonably should have been—completed." (citation omitted)).

Having identified the relevant *Rodriguez* moment, in order to determine whether there was a Fourth Amendment violation, the issue is whether Trooper Clemons had reasonable suspicion when he initiated the additional criminal background check such that he could prolong the traffic stop. *See Garner*, 961 F.3d at 271 (determining whether there was reasonable suspicion after identifying the *Rodriguez* moment).

"To lawfully extend a stop beyond when tasks tied to its initial mission are completed or reasonably should have been completed, an officer must have an objectively reasonable and

---

[6] The Court does not suggest that a routine traffic stop can never evolve into a more prolonged investigation into criminal activity generally. An officer, however, is required to realize the appropriate level of suspicion to do so. And that is lacking here.

articulable suspicion [] illegal activity had occurred or was occurring." *Rodriguez*, 575 U.S. at 355. Reasonable suspicion is more than a "hunch" but less than probable cause. *See Green*, 897 F.3d at 183. "Reasonable suspicion requires only a particularized and objective basis for suspecting . . . criminal activity and should not be derived from characteristics common to the vast majority of innocent individuals." *Id.* (internal quotation marks and citations omitted). Reasonable suspicion is determined by the totality of the circumstances. *See id.* In determining reasonable suspicion, Courts must recognize the ability of police officers with their training and experience "to make inferences from and deduction about the cumulative information available to them that might well elude an untrained person." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation omitted).

Trooper Clemons did not have reasonable suspicion to extend the stop and conduct the additional criminal background check. At the moment Trooper Clemons decided to conduct the criminal background check of Hunter and the passenger, he had only determined that Hunter (1) drove a rental car, (2) was in a high crime area and near a drug trafficking corridor, (3) had four cell phones amongst two passengers, and (4) was nervous. Trooper Clemons's belief these facts warranted an inquiry unrelated to the traffic stop was not objectively reasonable. The traffic stop was thus unlawfully extended, and evidence seized after he had completed the tasks related to the traffic stop must be suppressed.

At the moment Trooper Clemons decided to run a criminal background check, he had already determined Hunter had a valid driver's license and no warrants for his arrest and the same for the passenger. Although Hunter drove a rental car, Trooper Clemons did not testify that he had any concerns with Hunter's authority to drive the car or the validity of the rental agreement. Hunter had also indicated his truck was in the shop, and there was nothing in the record to contradict this

claim. In the initial conversation with Trooper Clemons, Hunter was compliant with all requests and answered all questions without hesitation. He explained he was headed to a gas station and then on to see his grandmother in Philadelphia. Nothing in the record places this information into question nor did Trooper Clemons testify he doubted Hunter's responses to his questions. Up until the point where Trooper Clemons first returns to his cruiser, the dashcam video shows nothing unusual about the traffic stop at all.

Despite this, Trooper Clemons testified he was suspicious because Hunter was visibly nervous, Hunter drove a rental car, there were four cell phones among Hunter and the passenger, and Hunter was driving from a high intensity drug trafficking area and near a drug trafficking corridor. These facts, however, even taken together, do not support reasonable suspicion.

Initially, the Court rejects Trooper Clemons's testimony regarding Hunter's nervousness. Trooper Clemons admitted most people are nervous upon being pulled over for a traffic stop. Nervousness is a characteristic attributed to the "vast majority of innocent individuals." *Green*, 897 F.3d at 183. Also, Trooper Clemons did not contend Hunter was any more nervous than most people who are pulled over. Trooper Clemons's testimony on Hunter's nervousness was exaggerated and unbelievable, i.e., intense shaking and wet from perspiration.[7] And the dashcam video does not show Hunter was nervous (at least not noticeably and to the extent Trooper Clemons claims with visible shaking).

---

[7] The Court also notes Trooper Clemons contends Hunter was initially dry and then became "wet" from building perspiration. *See* Tr. 31:1–6. He also testified his breathing rate changed throughout his initial conversation with Hunter. *See id.* at 31:7–15. These details only provide the Court with further basis for rejecting Trooper Clemons's testimony on Hunter's nervousness. The initial conversation only lasted about one minute. It is unbelievable that Hunter went from completely dry to visibly wet with perspiration within that time frame. And if Trooper Clemons's observation of Hunter's wet skin appeared after that initial conversation, then that fact did not contribute to his suspicion because the relevant moment for analyzing suspicion happened before he returned to speak to Hunter.

Trooper Clemons's testimony was geared to what he thought he needed to say. Most facts were "indicative of nervousness" even when he stated something was "not the most uncommon thing." Tr. 44:17–25. And some of his testimony was simply counterintuitive. For instance, Trooper Clemons testified most individuals become less nervous the longer a traffic stop lasts, as opposed to Hunter who became more nervous. This testimony belies commonsense.[8] Most people become more nervous the longer a traffic stop lasts. And Trooper Clemons admitted as much. *See* Tr. 62:2–16. The Court thus rejects Trooper Clemons's testimony insofar as he contends Hunter was so nervous it raised his suspicion.

Upon consideration of the other factors and the totality of the circumstances, the Court does not find the Government has established Trooper Clemons had reasonable suspicion. Trooper Clemons only relied on the cell phones, the area and direction in which Hunter was driving, and the rental car. Not one of these facts on its own correlates with criminal activity and therefore they do not carry much weight in supporting reasonable suspicion. "In making a determination of reasonable suspicion, the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Brown*, 448 F.3d 239, 252 (3d Cir. 2006) (internal citations and quotation marks omitted). The Court will discuss each fact in turn. But the Court's determination is premised on considering these facts together under the totality of the circumstances. *See id.* at 247.

Trooper Clemons testified drug traffickers often use multiple cell phones. *See* Tr. 39:16–22. This may be true, but he also testified it is common for people to own more than one cell phone. This was not a circumstance where a single individual had four cell phones in the center console.

---

[8] This is particularly true when you consider the race of the occupants and what is now known about interactions between Black men and law enforcement.

Four cell phones amongst two individuals does not seem odd even if drug traffickers use multiple cell phones. This fact along with other indications of drug trafficking specifically might warrant reasonable suspicion, but still carries a minimal degree of suspicion.

Hunter traveling away from a high intensity drug trafficking area and near a drug trafficking corridor also carries a minimal degree of suspicion. As an initial matter, this generalized statement fails to meet the Fourth Amendment's "demand for specificity." *Terry*, 392 U.S. at 21 n.18. Trooper Clemons contends Hunter stated he was driving from Chester, which is a high intensity drug trafficking area. In the dashcam video, however, Hunter does not state he is driving from Chester. Rather, Trooper Clemons asked Hunter if he was "from the area," to which Hunter replied "yeah." DCV 0:01:40–42. Hunter only stated he was headed to Philadelphia to see his grandmother and did not actually mention where he was driving from at any point in the initial conversation with Trooper Clemons. The Court acknowledges Trooper Clemons's testimony that Chester is approximately one to two miles away from where the traffic stop occurred, but it is certainly not clear from the record that Hunter was in fact driving from Chester (or another high intensity drug trafficking area) specifically.

As for Hunter driving near a drug trafficking corridor, the Court finds this alleged fact, in these circumstances, carries a minimal degree of suspicion. The traffic stop occurred on Stewart Avenue, a connector road between Highway 291 and I-95, in Ridley Township. But I-95 is traveled by millions of people each day. Hunter driving near or towards I-95 is hardly suspicious especially when you consider the time of day (mid-morning). To the extent driving near I-95 has a degree of suspicion, the Court finds it minimal.

Finally, although Trooper Clemons believed Hunter's use of the rental car also raised his suspicion, any suspicion was minimal. There was nothing unusual about Hunter's rental car and

13

"the overwhelming majority of rental car drivers on our nation's highways are innocent travelers with entirely legitimate purposes." *United States v. Williams*, 808 F.3d 238, 247 (4th Cir. 2015). Trooper Clemons testified most people have a backstory to their rental car use and Hunter's statement that his truck was in the shop was "vague." Trooper Clemons, however, did not inquire any further regarding the rental car use. Although Hunter's response was brief, Trooper Clemons did not identify any other reason to question Hunter's rental car use or his authority to drive the car. As with the rest of the traffic stop, Hunter was completely compliant and answered all questions. Hunter may not have provided as much detail as Trooper Clemons had hoped for, but his failure to do so in the absence of more probing questions hardly raises a significant degree of suspicion.

In other cases where rental car use has created suspicion, it was combined with unauthorized rental car use, rental stickers removed from the car windows, a violation of the rental agreement, or the scent of marijuana or other drugs (or a visible attempt to conceal any drug-related scents). *See, e.g.*, *Garner*, 961 F.3d at 271–72 (finding reasonable suspicion when rental car had removed window stickers, air fresheners attached to each air vent, and the rental agreement expired two weeks before traffic stop); *United States v. Winters*, 782 F.3d 289, 300 (6th Cir. 2015) (finding a rental car agreement that was several weeks overdue or one that did not list the driver as authorized was a supporting factor for reasonable suspicion). With nothing unusual about the rental car, this factor is given little weight in determining reasonable suspicion.

The Court recognizes Trooper Clemons's inferences from these factors may be unique to his experience and education as a state trooper. But even accepting his inferences and impressions of his interaction with Hunter, the Court is not persuaded there was reasonable suspicion criminal activity was afoot. Upon review of the dashcam video, at the point Trooper Clemons first returned

to his cruiser, the stop was unremarkable. Each fact on its own carries a minimal degree of suspicion, and three minimally suspicious facts in the context of *this* traffic stop are simply insufficient to support reasonable suspicion that criminal activity was occurring. At best, Trooper Clemons's perception of these facts and the link to criminal activity was merely a hunch. The Government is required to present evidence articulating reasonable suspicion to prolong a traffic stop. And in this case, it has not.

**CONCLUSION**

Trooper Clemons completed the tasks tied to the traffic stop before he conducted an additional criminal background check on Hunter and the passenger. Because Trooper Clemons extended the traffic stop beyond that point and he did so without sufficient suspicion to justify the continued seizure, the prolonged stop was unconstitutional. The Court will therefore grant Hunter's motion to suppress evidence of the firearm seized after the traffic stop should have been completed.

An appropriate order follows.

BY THE COURT:


 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.