IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL ACTION |
| | : | |
| v. | : | No. 19-635 |
| | : | |
| JAMAR HUNTER | : | |

**MEMORANDUM**

**Chief Judge Juan R. Sánchez**                                             **November 17, 2021**

      Jamar Hunter is charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). The Court previously granted Hunter's motion to suppress evidence of a firearm recovered during an unconstitutionally prolonged traffic stop. The Government now moves the Court to reconsider its ruling. The Government argues the Court misapplied Supreme Court precedent on the type of intrusions a police officer may make during a traffic stop to ensure their personal safety. Upon reconsideration, the Court finds it committed no errors of law or fact and will deny the motion.

**BACKGROUND[1]**

      On December 12, 2018, Jamar Hunter was driving on a local road towards Interstate 95 in Ridley Township, Pennsylvania with a passenger, Deshaun Davis. Pennsylvania State Trooper Galen Clemons observed Hunter commit several traffic code violations and pulled the vehicle over. Clemons collected documentation from the two men and asked basic questions about their travels before returning to his vehicle.

      Clemons proceeded to review the two men's driver's license information, check for outstanding warrants, and confirm proof of insurance and vehicle registration. Trooper Clemons

---

[1] The Court only summarizes the operative facts necessary for the Government's motion for reconsideration. The Court's findings of fact and conclusions of law are presented in the August 12, 2021, Memorandum Opinion.

then decided to take the extra step of checking the two men's criminal histories in two separate databases.[2] The search revealed both Hunter and Davis were felons with significant criminal histories. Trooper Clemons returned to Hunter, ordered him to step out of his vehicle, and performed a *Terry* frisk that revealed a handgun tucked in his waistband. Trooper Clemons then handcuffed and arrested Hunter.

On October 23, 2019, Jamar Hunter was charged with one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). On February 10, 2020, Hunter filed a motion to suppress the firearm, and the Court held a suppression hearing on June 2, 2021. On August 12, 2021, the Court granted Hunter's motion and suppressed the firearm.

The Court first determined when Trooper Clemons completed, or should have completed, the tasks tied to the traffic stop, which is the so-called "*Rodriguez* moment." The Court found the mission of the traffic stop was completed, or reasonably should have been completed, at the point immediately before Trooper Clemons decided to run a computerized criminal history check for Hunter and Davis. At this point, he should have issued a ticket or a warning to Hunter. His decision to run an additional check was made for further investigation into general criminal activity and therefore was not related to the objective of the stop. The seizure became unlawful at this point because Trooper Clemons also did not have reasonable suspicion to justify continuing the seizure to pursue such an investigation.

The Government alleges the Court erred by failing to consider the second part of the *Rodriguez* analysis. Although a traffic stop may not last longer than is necessary to dispose of the traffic violation—absent independent reasonable suspicion to continue the investigation—officers

---

[2] Trooper Clemons's reasons for performing these searches and the specifics of what he searched for are detailed in the Court's August 12, 2021, Memorandum Opinion.

may take certain safety precautions even if those precautions are unrelated to the mission of the stop. The Government claims the criminal history searches were an off-mission task that was nevertheless a permissible intrusion performed for Trooper Clemons's own safety. The Government also argues the results of the criminal records check established reasonable suspicion that Hunter and Davis were involved in narcotics trafficking and Trooper Clemons's continued seizure and pat down of Hunter was therefore constitutional.

The Government claims the Court committed an error of law in misapplying *Rodriguez* and asks for reconsideration of the Court's suppression order using a correct application of the case.

**DISCUSSION**

The Court already considered Trooper Clemons's reasons for conducting the criminal records search and concluded he conducted the search to further investigate drug trafficking. He did not perform the search out of concerns for his personal safety. His testimony supports this conclusion. While Circuit courts are divided on this issue, it remains an open question in the Third Circuit whether officers may perform criminal history searches for personal safety reasons. The Court properly considered the *de minimis* intrusion/officer safety rule that the Supreme Court established in *Pennsylvania v. Mimms* and rejected in *Rodriguez v. United States*. The Court simply refused to apply it to Hunter's stop in light of the evidence presented.

A lawful roadside stop begins when the police order a vehicle to pull over for investigation of a traffic violation. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). This temporary seizure remains for the duration of the stop, similar to a *Terry* stop. *Id.* The allowable duration of police inquiries in the traffic-stop context is determined by the stop's mission, which is to "address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United*

*States*, 575 U.S. 348, 344 (2015). The stop "may last no longer than is necessary to effectuate th[at] purpose," and "authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.*

An officer's mission also includes "ordinary inquiries incident to the stop.'" *Id.* at 354 (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). This includes checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. *Rodriguez*, 575 U.S. at 355 (citations omitted). An officer's questions relating to a driver's travel plans may also "ordinarily fall within the scope of a traffic stop." *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003). Inquiries and delays incident to an officer's safety also fall within the permissible scope of a traffic stop. *Rodriguez*, 575 U.S. at 356. "Traffic stops are 'especially fraught with danger to police officers,' so an officer may need to take certain negligibly burdensome precautions in order to complete his mission safely." *Id.* (quoting *Johnson*, 555 U.S. at 330).

An officer may not, however, employ "measure[s] aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Rodriguez*, 575 U.S. at 356 (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 40-41, (2000)). "On-scene investigation into other crimes" "detours" from the mission of enforcing the traffic laws and ensuring officer safety inherent in each traffic stop. *Id.* ("Highway and officer safety are interests different in kind from the Government's endeavor to detect crime in general.").

Once a valid traffic stop has been initiated, however, "'an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond

4

the reason for the stop and detain the vehicle and its occupants for further investigation.'" *Lewis*, 672 F.3d at 237 (quoting *Givan*, 320 F.3d at 458 (citation omitted)). The officer may only do so if the officer establishes the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 357 (citations omitted).

Trooper Clemons's testimony confirms the reason he searched for Hunter's and Davis's criminal histories was to establish reasonable suspicion to further an investigation into drug trafficking. During the suppression hearing, Trooper Clemons spoke on three occasions about the reasons he would ever perform a criminal records check. The first line of questioning proceeded as follows:

> Q: And you do that routinely?
> A: Only if I have reasonable suspicion that there is criminal activity afoot, that's when I run the criminal history.
> Q: All right. So when - - when you - - when you ran the N.C.I.C. and the license came   back valid, there were no warrants, and the car was not stolen, it was just rental - -.
> A: It was not stolen, yes.
> Q: Right, it was just rental. You believe that you could go further and check the prior criminal history of these two individuals because, at that point in time, you think there's reasonable suspicion to believe that they are involved in drugs or they are armed and dangerous?
> A: Yes.

Tr. 58:20-59:10.

Putting aside Trooper Clemons's belief that he had reasonable suspicion to perform the search—the Court concluded he did not—Trooper Clemons directly stated the *only* time he performs a criminal history search is when he believes criminal activity is afoot. Counsel for the Government then asked him in a long compound question ultimately asking whether an officer's belief that a suspect is armed and dangerous could be a reason to run a criminal history search, and Trooper Clemons respond with a blanket "yes."

The second instance proceeded as follows:

| | |
|---|---|
| The Court: | But he accessed other information, which is, he accessed their criminal history. And I want to know whether that is routine or not routine as a matter of practice, or there has to be something else that he has to point to, to justify that further search. |
| Mr. McDonnell: | Let - - let me ask the trooper, your Honor. |
| The Court: | All right. Go ahead. |
| Q: | Sir, is it routine that you would search a person's criminal history in the - - that Triple I software that you mentioned? |
| A: | All right. So with the way that I operate, I make - - I have made dozens of - - narcotics arrests. So I have experience looking for the indicators, identifying the indicators. So when I was on patrol in Media, I would routinely use this database to run offenders. And I would use this to bolster my reasonable suspicion. |

Tr. 67:23-68:16. Trooper Clemons again explained here that his primary reason for searching drivers' criminal histories was to bolster reasonable suspicion for purposes of continuing narcotics investigations. He did not reference his own safety as a concern during this line of questioning.

Finally, Trooper Clemons testified as follows:

| | |
|---|---|
| The Court: | So it's not regular practice to use it, it depends on the circumstances and you use it to bolster your belief that there may be criminal activity afoot? |
| The Witness: | Yes, your Honor. |

Tr. 68:25-69:4. The Court found Trooper Clemons credible in that his reason for performing the search in Hunter's case was his belief that criminal activity was afoot. He did not do so to ensure his personal safety while he addressed the traffic violation. At the first instance, the Court also explained as much in the August 12, 2021, Memorandum Opinion.[3]

---

[3] August 12, 2021 Mem. 9 ("A criminal background check, on the other hand, is aimed at 'detecting criminal activity more generally," not the mission of the traffic stop. *Garner*, 961 F.3d at 271 (quoting *Green*, 897 F.3d at 179). Trooper Clemons made no claim that the criminal background check assisted him in addressing the traffic violation.").

6

In addition to hearing Trooper Clemons's testimony, the Court reviewed a dashcam video of the traffic stop. The Court noted, "[u]p until the point whether Trooper Clemons first returns to his cruiser, the dashcam video shows nothing unusual about the traffic stop at all." August 12, 2021 Mem. 11. The video evidence therefore confirms Trooper Clemons's testimony that the sole reason he elected to perform the search was to investigate other criminal activity. This on-scene investigation is precisely what *Rodriguez* prohibits.

While Trooper Clemons's own words are dispositive as to his intentions, there is no binding case law for the proposition that an officer is even *permitted* to perform a criminal history search to protect his or her safety. The Government's reliance on *Rodriguez* and Circuit case law for this proposition is misplaced. Although the *Rodriguez* opinion cited a Tenth Circuit case that purports to authorize criminal history searches for officer safety reasons,[4] the Court in *Rodriguez* never mentioned criminal history searches in its list of permissible intrusions for officer safety. The very next sentence of the opinion states, "on-scene investigation into other crimes, however, detours from that mission. So too do safety precautions taken in order to facilitate such detours." *Rodriguez*, 575 U.S. at 356 (citations omitted).

---

[4] Importantly, the Court used a "cf." signal to cite the case, *United States v. Holt*, 473 F.3d 1265 (10th Cir. 2001). This signal is used to cite authority that is "different from the main proposition but sufficiently analogous to lend support." *Bluebook, A Uniform System of Citation* (20th ed. 2015). The Court finds this elusive reference inconclusive.

The Third Circuit has also not said whether criminal history searches are permissible safety precautions.[5] With this uncertainty in the federal appellate courts[6] as to whether an officer may search a driver's criminal history solely out of concerns for the officer's safety while processing a traffic stop, the Court returns to Trooper Clemons's own testimony that, in this instance, he did so to investigate drug trafficking.

Trooper Clemons performed the criminal history search on Hunter and Davis to gather reasonable suspicion to further an investigation. He did not do this out of personal safety concerns. His testimony supports this conclusion. Because the appellate courts have not concretely addressed this issue, there remains some question about whether an officer is permitted to do this at all, even if the officer did not testify as to his state of mind as Trooper Clemons did here. Trooper Clemons also lacked independent reasonable suspicion to perform the criminal history search for the reasons

---

[5] *See, e.g.*, *United States v. Clark*, 902 F.3d 404 (3d Cir. 2018) (holding the stop became unconstitutional at the moment an officer began a series of questions related to the driver's criminal history because such questions were unrelated to the stop). Although the officer in *Clark* had performed a criminal history check prior to initiating the questioning—and the district court did not find the criminal history check objectionable—the constitutionality of the criminal history check was not directly discussed by the court on appeal. Therefore, to cite *Clark* for the proposition that criminal history searches are allowable for officer safety reasons is a misstatement of the holding of the case.

The other Third Circuit cases cited by the Government are even further off base. *See, e.g.*, *United States v. Green*, 897 F.3d 173 (3d Cir. 2018) (analyzing the appropriate time to measure the "*Rodriguez* moment" and holding the officer's unrelated phone call to a colleague during a traffic stop was unrelated to the mission of the stop); *United States v. Garner*, 961 F.3d 264 (3d Cir. 2020) (holding the officer's extension of the stop was lawful because the officer possessed reasonable suspicion).

[6] The cited Tenth Circuit case and its progeny represent the most permissible approach for police officers, but the Court notes the Ninth Circuit has taken a more restrictive approach to police officers justifying criminal history searches as a routine part of traffic stops. *See, e.g.*, *United States v. Evans*, 786 F.3d 779 (9th Cir. 2015) (holding an ex-felon registration check and a dog sniff, each of which was unrelated to the traffic violation, unconstitutionally prolonged the duration of the traffic stop).

contained in the Court's August 12, 2021, findings of fact and conclusions of law. The Government does not allege any error in this regard. His prolonging of the traffic stop to perform an unrelated criminal history search, without independent reasonable suspicion to do so, was therefore unconstitutional.

**CONCLUSION**

The Court perceives no errors of law or fact in the August 12, 2021, Memorandum Opinion. The motion for reconsideration is therefore denied.

An appropriate order follows.

BY THE COURT:

 /s/ Juan R. Sánchez
Juan R. Sánchez, C.J.